## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.**_____

DIANWEN CUI, LEI GU, SUFEN LENG, XUE MEI, ZHOU MEI, YAN SONG, LU WANG, YUE WU, ZHUO YANG, JINGWEN ZHANG, LEI ZHANG, LING ZHANG, XIAOHONG ZHANG, QIN ZHOU, XUN ZHU, CHUNYI ZOU, individually, and on behalf of COLORADO REGIONAL CENTER PROJECT SOLARIS LLLP,

      Plaintiffs,

v.

WAVELAND VENTURES, LLC, COLORADO REGIONAL CENTER, LLC, COLORADO REGIONAL CENTER I, LLC, COLORADO REGIONAL CENTER PROJECT SOLARIS LLLP,  SOLARIS PROPERTY OWNER LLC, SOLARIS PROPERTY OWNER LLC I, and JOHN DOES 1-10,

      Defendants,

-and-

COLORADO REGIONAL CENTER PROJECT SOLARIS LLLP,

      Nominal Defendant.

---

## COMPLAINT AND JURY TRIAL DEMAND

---

      Plaintiffs Dianwen Cui, Lei Gu, Sufen Leng, Xue Mei, Zhou Mei, Yan Song, Lu Wang, Yue Wu, Zhuo Yang, Jingwen Zhang, Lei Zhang, Ling Zhang, Xiaohong Zhang, Qin Zhou, Xun Zhu, Chunyi Zou (collectively "EB-5 Investors" or "Plaintiffs") by their undersigned attorneys, allege the following:

### INTRODUCTORY STATEMENT

    1.    "EB-5 investors 'are not return-driven – they're return-agnostic.' 'From that

1

standpoint, it's a cheap source of capital for developers.'[1]  – Rick Hayes, the Chief Financial

Officer of Waveland Ventures, LLC ("Waveland") and Managing Partner of Colorado Regional

Center ("CRC").

2.      The above statements sum up the way defendants view EB-5 investors, a source

of cheap capital that do not care about their returns.  Based on this principle, defendants

structured a complicated scheme to induce Chinese investors to fork over approximately half a

million dollars each.  This scheme financially benefited all but the EB-5 Investors.

3.      This case involves sixteen of 165 Chinese nationals who each invested $500,000[2]

to help fund the completion of a condominium project located in Vail, Colorado aptly called The

Residences at Solaris-Vail ("Solaris").  The developer of Solaris is Solaris Property Owner

("SPO").

4.      The 165 Chinese investors collectively invested $82.5[3] million into a Colorado

limited partnership, Colorado Regional Center Project Solaris LLLP ("LLLP") that Waveland,

and CRC created.  CRC's subsidiary, Colorado Regional Center I, LLC ("GP") would be the

general partner of the LLLP and received a 1% of partnership interest.  The LLLP would then

lend the EB-5 Investors' money to SPO.  In exchange, SPO was supposed to pay an annual 5%

interest to the LLLP.   The loan between the LLLP and SPO (the "Loan") was supposed to be

100% collateralized and the interest on the Loan guaranteed by SPO's principal, Peter Knobel.

The Loan was due within 5 years from the date of the advancement.

5.      On paper, Solaris seemed like the ideal investment.  CRC would collect a 2%

annual management fee, SPO would receive the much needed funding at a low interest rate to

---

[1] https://www.cobizmag.com/Articles/Fast-track-to-US-residency/
[2] Some investors paid $550,000 and some paid $535,000 depending on whether the investor paid for his/her's own immigration attorney.
[3] Not including "administrative fees" which vary between $50,000 to $35,000 for each investor.

complete Solaris, without the rigid underwriting protocols required by banks, GP would obtain a 1% ownership interest of the LLLP, the LLLP would receive rental income and an annual 5% interest from the SPO, and the EB-5 Investors would earn a 2% return based on the Loan that was 100% collateralized and obtain a green card to boot.  When Solaris is completed, the LLLP would have multiple exit strategies that would allow each EB-5 Investor to receive the return of their capital plus any residual from the dissolution of the LLLP.

6.      In reality, each of the defendants reaped a financial benefit except for the EB-5 Investors.

7.      While any "investment" by its definition carries risk, this particular one was intentionally concocted by the defendants to benefit themselves at the expense of the EB-5 Investors.

8.      In order to seek needed additional financing for Solaris, SPO and Waveland established the various business entities to raise EB-5 capital.  To induce the EB-5 Investors to invest in Solaris, Waveland through the various entities it owned and controlled, colluded with SPO to defraud the EB-5 Investors by misrepresenting to them that the Loan was 100% collateralized and safe.

9.      In fact, the defendants and each of them knew that the Loan would not and in fact did not provide the promised 100% security to the EB-5 Investors, let alone the promised 2% return.

10.      While most if not all of the EB-5 Investors have received their green cards, their investments have been stuck in limbo.  The $82.5 million loan to SPO was never paid back as SPO opted to tender title to 19 of its condominium units to the LLLP *three years before their respective maturity dates*.  Despite SPO's election, title to the 19 (now 17) units remained with

SPO, who assigned it to Solaris Property Owners I, LLC ("SPO I").

11.     Although the GP has repeatedly maintained that the 19 condominium units' fair market value  equaled to the Loan amount, the truth is that the Loan was intentionally under collateralized.

12.     By all means, this is *not* a textbook case of fraud.  The Loan, the Private Placement Memorandum and related documents ("Offering Documents") were structured by sophisticated real estate and investment professionals to take advantage of the EB-5 Investors. Defendants took advantage of the language and distance barriers to intentionally deceive the EB-5 Investors by inflating the value of the collateral and under collateralizing  the Loan. The EB-5 Investors were never told the entire story.  As a result, the EB-5 Investors, through the use of counsel and corroboration with other professionals, were only recently in the past few months able to decipher the scheme used to deceive the Plaintiffs.

13.     Although Waveland, CRC, LLLP and SPO targeted wealthy Chinese investors, they did not provide all investors with Chinese versions of the Offering Documents.  At least, they left it up to their agents as to what materials to show the prospective investors.  In fact, most of the Chinese Investors were never even provided with full sets of the Offering Documents before they were asked to sign them.  Those that did receive the densely written 165 page document did not receive any of the exhibits.  Some were only provided with the signature pages, incredibly, with one of the pages acknowledging that the investor was proficient in English.  Most investors also were not provided with any meaningful time to review what documents they were signing.

14.     Through defendants' paid agents, the EB-5 Investors were misled into investing into the LLLP believing that their investment had a 2% return and was fully secured by

collateral.  They believed that at the maturity date of the Loan,  the EB-5 Investors would be able to exit from the LLLP with the return of their investment in its entirety.

16. 15.     During the pendency of their investment, the GP repeatedly concealed pertinent information from the EB-5 Investors and fed countless excuses as to why the LLLP was unable to pay the "*preferred return*" and why the EB-5 Investors were unable to pull their investments from the LLLP.  They even encouraged the EB-5 Investors to exit the LLLP by exercising a "put option" and withdrawal their investments on less than 50 cents on the dollar.

16.     Within the past few months, through the retention of counsel, the Plaintiffs were able to uncover defendants' scheme and violations.

## PARTIES

**A.     Plaintiffs**

17.     Plaintiff Dianwen Cui is a citizen of the People's Republic of China who resides in the State of Washington.

18.     Plaintiff Lei Gu is a citizen of the People's Republic of China who resides in the State of California.

19.     Plaintiff Sufen Leng is a citizen of the United States who resides in the State of California.

20.     Plaintiff Xue Mei is a citizen of the People's Republic of China who resides in the State of California.

21.     Plaintiff Zhou Mei is a citizen of the People's Republic of China who resides in the State of California.

22.     Plaintiff Yan Song is a citizen of the People's Republic of China who resides in California.

23.     Plaintiff Lu Wang is a citizen of the People's Republic of China who resides in the State of Connecticut.

24.     Plaintiff Yue Wu is a citizen of the People's Republic of China who resides in the State of Minneapolis

25.     Plaintiff Zhuo Yang is a citizen of the People's Republic of China who resides in the State of California.

26.     Plaintiff Jingwen Zhang is a citizen of the People's Republic of China who resides in the State of California.

27.     Plaintiff Lei Zhang is a citizen of the People's Republic of China who resides in the State of California.

28.     Plaintiff Ling Zhang is a citizen of the People's Republic of China who resides in the State of California.

29.     Plaintiff Xiaohong Zhang is a citizen of the People's Republic of China who resides in the State of California.

30.     Plaintiff Qin Zhou is a citizen of the People's Republic of China who resides in the State of California.

31.     Plaintiff Xun Zhu is a citizen of the People's Republic of China who resides in the State of New York.

32.     Plaintiff Chunyi Zou is a citizen of the People's Republic of China who resides in California.

**B.     Defendants**

33.     Defendant Waveland Ventures, LLC is a Texas limited liability company doing business in the State of Colorado.

34.     Defendant Colorado Regional Center, LLC is a Colorado limited liability company.  CRC is a wholly owned subsidiary of Waveland.

35.     Defendant Colorado Regional Center I, LLC is a Colorado limited liability company.  CRC I is a wholly owned subsidiary of CRC.

36.     Defendant Colorado Regional Center Project Solaris LLLP, is a Colorado limited liability limited partnership.  The LLP's general partner is CRC I.

37.     Defendant Solaris Property Owner LLC, is a Delaware limited liability company with its principal place of business in Vail, Colorado.

38.     Defendant Solaris Property Owner I LLC, is a Colorado limited liability company.  SPO I is a wholly owned subsidiary of SPO.

39.     John Does 1-10 are additional parties who participated in the scheme to defraud the EB-5 Investors.  Plaintiffs will name these defendants once they have had an opportunity to conduct relevant discovery to identify them.

40.     Defendants Waveland, CRC, GP, SPO, SPO I and Doe Defendants are collectively referred to as "Defendants."

## JURISDICTION AND VENUE

41.     Plaintiffs bring their Complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceed $75,000.

42.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331, in that this action arises under federal law, namely 15 U.S.C. §78(b) and Rule 10b-5 thereunder.

43.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state-law claim that is related to, and form parts of, the same controversy.

44.     This Court has personal jurisdiction over the defendants herein because they maintain a principal place of business in this judicial district, the lawsuit arises out of defendants' activities in this district, and defendants consented to personal jurisdiction in the State of Colorado for any action in connect with the Offering Documents.

45.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because all Defendants have their principal place of business in which this judicial district is located.  Furthermore, this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred and a substantial part of the property that is the subject of this action is situated.

## GENERAL ALLEGATIONS

### A.     The Employment Based Fifth Preference

46.     The United States Congress created the EB-5 program in 1990 to stimulate the United States economy through job creation and capital investment by foreign investors.  The EB-5 investor immigration program allows foreign investors seeking to immigrate to the United States to obtain permanent residency by investing at least $500,000 in a company or project located in the United States that generates at least ten jobs per foreign investor.

47.     Foreign investors may invest directly in a new commercial enterprise or through a new commercial enterprise affiliated with a regional center approved by the United States Citizenship and Immigration Services ("USCIS").  An EB-5 Regional Center is an organization designated by the USCIS that sponsors capital investment projects for investment by EB-5 investors.  The benefits of investing through a regional center is that it offers the advantages of indirect and induced job creation, the freedom to invest in any project located within the United States, and not having to manage the day-to-day operations of the business.

48.     The EB-5 program has been exceptionally popular amongst immigrants from the

People's Republic of China, where thousands of Chinese nationals have been able to obtain U.S.

permanent residency (green cards) since the program's inception.  In fact, statics show that, at

one point, approximately 85% of EB-5 green cards have been issued to Chinese nationals.

49.     Due to the job creation component, the EB-5 projects have also generated

countless jobs and boosted the local U.S. economies.

50.     Unfortunately, as much good as this program has created, there has been rampant

fraud in the program as well.  There have attempts to misuse the EB-5 program as a means to

carry out fraudulent acts.  EB-5 investors are most susceptible to fraud because English is almost

always a second language, if they speak or read the language at all.  Moreover, typically, the

larger U.S. projects are promoted through overseas immigration consultants, who are not

licensed broker-dealers.  The immigration consultants are usually paid a commission fee by a

developer or a regional center for each investor and have little incentive, experience or ability to

thoroughly vet a project.  Even once they invest in a project through a regional center, because

they entrust the management of their investment to fiduciaries, the investors are taken advantage

of because of the language and distance barriers.

**B.     The Solicitation and Purported Investment**

51.     Since most EB-5 investors are from China, defendants targeted China for the

Solaris project.

52.     To attract investors, CRC entered into "Agency Agreements" with multiple

foreign immigration consultants ("Consultants").   These consultants are not licensed broker-

dealers.

53.     Within the Agency Agreements, the immigration consultant or "Agent" agrees to

promote CRC's Solaris project by using various advertising, promotional and marketing means as the Agent deem necessary and approved by CRC.

54.     In return, the Agent would receive an average fee of $35,000 for each investor that subscribes to the Solaris project.  In some cases, CRC would provide an additional 1% of the investment to the Agent.

55.     In order to sell Solaris, or for that matter any investment, the prospects of the return of investment and return on investment must be strong.  Here, Waveland, the controlling member of CRC, provided various marketing materials to their agents to sell the Solaris project.

56.     One of the PowerPoint presentation provided through Waveland and CRC's agents, for example, had the following selling points for the Solaris investment:

- It is a safe, well-structured real estate investment that will allow investors and their immediate families to obtain permanent green cards and residency in the United States.

- It is collateralized by Deeds of Trust

- Waveland claims it manages $750 million in investment capital.

- It lists various successful projects, to taut experience.

- Its track record includes the issuance of several AAA rated secured promissory notes varying from 8% to double digits.

- It claims that Waveland has a proven track record of financing large, complex transactions, with some of the largest investment banks in the world.

- It claims that they have an experienced management team with over 110 years combined real-estate and investment experience.  – exposure to both up and down market cycles.  The management consists of: Rick Hayes who has 30 years in

financial services industry and manages in excess of $600 million in private

equity and real estate investments; Charles Schwartz as having 35 years of

corporate and real estate law experience; Paul Deslongchpas as having 20 years of

operational and investment experience; Johan Segerdahl of having 30 years in

financial services industry.

- It claims that they employ a conservative investment philosophy. "Investment 100% collateralized with real property at closing." Multiple exit strategies available to monetize investment.

- It says they are "committed to each investor's success" ;

- It says that they have "ongoing monitoring and compliance."

- It says that they perform "quarterly reporting of project status"

- It says that "[t]he note will be 100% secured by condominium units in the project."

- It says the "return" will be guaranteed by the developer for 5 years.

- It says that LLLP will have the right to rent the condo units and receive all of the associated revenue."

- It says that each investor would have access to use one of Solaris' units, free of charge, for a seven day period during the peak months and 14 days the remainder of the year.

- It says that a "2.0% limited partner preferred return" would be given to the investor.

- It says that investors would have use of condo units.

- It says there is a "100% Return of Principal"

- It says this is an "[i]nvestment secured with first deeds of trust. No leverage, ability to convert loan for full value of secured properties."

- It says that the developer would pay interest quarterly for 5 years.

- It says that "5 years from closing [of the Loan], the GP will pursue the monetization of the investors principal balance ($500,000)."

57.     Based on these clear representations by Waveland, CRC and SPO, the EB-5 Investors reasonably thought that should SPO incur a default on the Loan, the LLLP would at least be able to foreclose on the collateral, which was supposed to secure 100% of the Loan amount.

58.     The Agent then employs strong sales pressure and threats that the subscription would run out to entice the investor to sign up.  The Offering Documents stated very clearly that only amount raised would be limited to $80 million. Yet, Defendants raised more than the allotted amount.

59.     Moreover, Waveland, CRC and SPO reviewed and approved the marketing materials including but not limited to the PowerPoint and other promotional materials and disseminated them to potential investors to solicit investments.

**C.     The Bait and Switch**

60.     While the PowerPoint is presented in both English and Chinese, the Offering Documents are usually only provided in English.

61.     While the Agent spends a great deal of time selling Solaris, the Agent does very little to explain the complexities of the Offering Documents.  The Agent usually provides no guidance as to the meaning of the Offering Documents.  There is usually little to no time to review, let alone have a professional review the Offering Documents.

62.     In some instances, the Agent only provides signature pages to the investor.

63.     In all instances, the Agent promises to provide a complete and fully executed Offering Documents to the investor, but in no instance did any of them receive them.

64.     In no instance did the Agent talk about risk.  They only dangle green cards, 2% returns and 100% return of investment to the investors.

65.     In reality, the Offering Documents are riddled with disclaimers, risk factors, and complex legal jargons and terms that most U.S. born individuals would find perplexing.

66.     There are some key differences between the Offering Documents and the PowerPoint presentations.  For example: 1)  the marketing materials gave the impression that the investment was safe and well-structured that would return all of the investor's money, but the Offering Documents contained countless disclaimers and risks; 2) in one set of marketing materials, there is no mention of the developer's ability to repay the Loan with condominium units in lieu of cash – it gave the false impression that the Loan was a standard loan secured by collateral but hidden as an Exhibit to the Offering Documents was a statement that the developer had the option of paying back the loan with condominium units; 3) in one set of marketing materials, there was no disclosure of the developer's right to prepay the loan in two years, but hidden in the voluminous Offering Documents was a statement that the developer could prepay within three years; 4) The marketing materials indicated that the Loan was fully collateralized, but none of the materials including the Offering Documents indicated that the developer and the GP had already agreed to preset the value of the collateral to match with  the developer's own sales price instead of fair market value; 5) the marketing materials promised the investors with an annual 2% interest, whereas the Offering Documents indicate that the preferred return was subject to the availability of funds and subordinate to expenses and the CRC's management fee.

67.     Had the investors been made aware that their funds would essentially be used to purchase condominium units at inflated prices set by the developer, they never would have invested their funds.

68.     Further evidencing the collusion amongst the defendants is the fact that although the underlying documents required SPO or its assignee SPO I to transfer title of the 19 units to the LLLP upon SPO's election to repay the Loan with equity, all title to the 19 units remained and continues to remain with SPO I.  From 2016 through 2018, Defendant GP repeatedly and in each and every notice, state that they were working with SPO to transfer title of the 19 units to the LLLP.  In reality, as early as April 2015, the SPO and the GP had already agreed that the SPO would hold onto title to each of the 19 collateralized units.

69.     All told, the EB-5 Investors were duped into believing they would receive 100% of their investment back upon receipt of their green card and repayment of the Loan.

**D.  Excuses and Concealment**

70.     Pursuant to the executed version of the Offering Documents, which none of the EB-5 Investors received despite being promised, the GP was required to periodically provide notice of the fair market value of the collateral to eligible investors.  Beginning in 2016 and continuing through 2019, there have been six such notices.  The notices were sent only to investors who have held their investment in the LLLP for at least three years, thus some of the Plaintiffs received all six notices and some of them received much less.  In the Notices, the GP offered "put rights" as an exit strategy.  Those who received the Notices became aware that the fair market value of the collateral was at one point almost 20% below the Loan amount.  In each of the Notices, the GP also indicate that it was in the processing of working with SPO to transfer title of the condominium units to the LLLP as the maturity dates for all of the loan advances have

all expired.  The latest of such Notices (Notice of Fair Market Value Number 6), showed that the

bulk value of the 18 units[4] was a meager $43 million, which is almost 50% less than the

Plaintiffs' investment.  In each of the Notices, the GP provided several excuses why the units

were below the face value of the Loan.  For example, the GP explained that the low value was

attributed to the lack of adequate comparable sales within the Solaris building and the lack of

comparable properties in the greater Vail area and the appraisers having the penchant for being

very conservative because of the Great Recession.  The GP also opined that the value of the units

would increase over time.  All of the excuses were meant to appease and conceal the EB-5

Investors.

71.     As the fair market value of the units continued to allegedly increase, the number

of EB-5 Investors seeking to exercise their "Put Rights" also increased.  Even though the number

of EB-5 Investors sought to exit the LLLP increased dramatically, the GP made little effort to

sell the units for sale.

72.     Only within the past few months through counsel did the EB-5 Investors discover

the relevancy of a 2015 secret agreement between the LLLP (signed by the GP) and the SPO

wherein it was agreed that despite representing to the EB-5 Investors that title of the units were

being transferred, the secret agreement was for SPO or its assignee, SPO I to continue to hold

onto title.  Furthermore, there was an agreement for SPO's own in-house broker, Solaris Real

Estate, LLC, to sell the units and that all sales commission would be split with the LLLP.

Moreover, the secret agreement forbade the listing of any units on the MLS.  As a result, only

one of the LLLP's units was sold between 2016 and 2019.  Upon information and belief, recently

one additional unit was sold but the GP has not released any of the details.

73.     It was recently discovered, after retention of counsel in the past several months,

---

[4] One of the unit was sold by eight limited partners exercising their put option.

that back in 2011, SPO and CRC had previously agreed to use pre-determined overinflated prices for the purposes of determining the collateral value of the units. Documents uncovered showed that the collateral was mainly limited to units facing North, which are considerably less in value than the South facing units which have glorious mountain views. None of the Defendants disclosed to the then-potential investors that the 100% collateral was based on the self-serving SPO sales price rather than fair market value.

74.     It was also recently discovered, after retention of counsel within the past couple of months, that many of the EB-5 Investors were forced to ratify the GP's authority to amend the Offering Documents, without consideration, waiving the Plaintiffs' usage rights of the Solaris condos. The Defendants, through their Agents, misrepresented that the investors needed to sign the ratification in order for them to receive their final green cards. This was blatantly false and was done so to deprive the Plaintiffs of their use of the condo units so that the units could be rented out for fees instead, which would ultimately inured to the benefit of CRC as it would collect the management fees. The right to use Solaris' units was not relevant to the Plaintiffs' ability to obtain their final green cards.

**E.     Conflicts of Interest**

75.     Besides the fraud and concealment uncovered through counsel, the EB-5 Investors have also discovered significant conflicts of interest. First, CRC was supposed to make sure that the investment was sound. CRC along with its parent company, Waveland, touted their real estate and financial industry experience in making profitable loans, real estate projects and financial investments. The LLLP also purportedly conducted extensive due diligence and hired third parties to assist in its due diligence on the Solaris project.   With their sophistication, the defendants never should have recommended the Loan to any of the EB-5 Investors. However,

CRC stood to benefit financially as it was to receive an annual 2% management fee. This fee amounts to $1.65 million annually. Meanwhile, GP received a 1%[5] partnership interest for simply being the GP. The GP then paid other vendors which were either owned by the SPO or other entities which are partially or wholly owned through Waveland. For example, the broker entrusted to sell the units for the LLLP, Solaris Real Estate Broker, LLC ("SRE") was a wholly owned subsidiary of SPO. SSRE not only had to promote and sell the LLLP's condominium units, it had to sell SPO's own units. During the time frame that Solaris Real Estate Broker, LLC was entrusted to sell the collateral units, it sold none, meanwhile it deferred all buyers to SPO's own units. As a result, there was a log jam of EB-5 Investors who patiently waited to get their investment back. Additionally, SPO had a right of first refusal rendering the sale of any of the LLLP's units unfeasible and unlikely. In the meantime, while due to a purported lack of funds, CRC had halted its collection on the annual 2% management fee, but according to a memo dated January 12, 2019, the LLLP owed $4,291,336 as of that date, which egregiously includes penalty interest. Accordingly, as long as the EB-5 Investors remain in the LLLP, CRC will continue to be eligible for the seven figure annual management fee *plus penalty interest.* Upon information and belief, another example is Elevation Resorts, the property management company that GP and SPO use to manage the rental of units at Solaris. Upon information and belief, Elevation Resorts is owned by Waveland.

76.     Additionally, the principals of Waveland, CRC, GP and Elevation Resorts are essentially run by the same group of people, Rick Hayes, Johan Segerdahl, Paul Deslongchaps, and Lacey Tomczuk. Mr. Hayes' daughter, Megan Hayes, also wears multiple hats for CRC, GP, Waveland and even Elevation Resorts, the rental and property management agency for

---

[5] Each EB-5 Investor, on the other hand, despite investing $535,000 to $550,000 each, was only entitled to 0.6% of the LLLP.

Solaris.

77.     Through counsel, the EB-5 Investors discovered that the defendants violated a number of securities violations.  They include the LLLP's failure to register as an investment company; the use of unregistered broker-dealers; violation  of section 10b of the Exchange Act to name a few.

**E.     Conspiracy, Aiding and Abetting and Concerted Action**

78.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Defendants caused the Company to conceal the true facts as alleged herein. The Defendants further aided and abetted and/or assisted each other in breaching their respective duties.  The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, securities violations and fraud; (ii) to conceal adverse information concerning the LLLP's operations, financial condition;  (iii) to artificially inflate the value of the collateral.  The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the LLLP to purposefully, recklessly, or negligently to conceal material facts, make materially misleading statements, fail to correct such misrepresentations, and violate applicable laws.  Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of its overall contribution to and furtherance of

the wrongdoing.  At all times relevant hereto, each of the Defendants was the agent of each of

the other Defendants and was at all times acting within the course and scope of such agency.

**F.      Derivative Allegations**

79.      Plaintiffs brings this action individually and derivatively and for the benefit of the

LLLP to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of

their fiduciary duties, fraud, securities violations and waste of corporate assets as well as the

aiding and abetting thereof.

80.      The LLLP is named as a defendant and as a nominal party in this action because

of the derivative portion of the Complaint.

81.      Plaintiffs are, and at all relevant times have been, limited partners of the LLLP.

Plaintiffs will adequately and fairly represent the interests of the LLLP in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative

litigation, to enforce and prosecute this action.

82.      A pre-suit demand on the GP is futile and, therefore, excused. At the time of filing

of this action, the GP of the LLLP consist of GP's parent company, CRC.  Plaintiffs need only to

allege demand futility was commenced.  In complete abdication of its fiduciary duties, the GP

either intentionally participated in causing the LLLP to issue the materially false and misleading

statements or did so recklessly.  As a result of the foregoing, the GP breached its fiduciary duties,

face a substantial likelihood of liability, are not disinterested, and demand upon them is futile,

and thus excused.


**COUNT I**

**(By Plaintiffs Individually for Fraud – Misrepresentation against All Defendants)**

83.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

84.     Defendants, and each of them, conspired to induce the Plaintiffs to invest into the LLLP by, among other things, making material misrepresentations and omissions as set forth in detail above in paragraphs, *inter alia*, 56, 66, 68, 70, 73 and 74.

85.     Throughout 2012 and continuing through the date of its last notice in 2019, Defendants repeatedly provided false and misleading materials to induce the Plaintiffs into investing their funds with the LLLP.

86.     Defendants conveyed the initial misleading information to the EB-5 Investors through their authorized Agents in China.  Defendants allowed their Agents to provide the false information through PowerPoint presentations, brochures and other written materials. Once the EB-5 Investors had already invested their funds with the LLLP, the Defendants, through their employees, continuously sent out false and misleading notices concerning the value of the collaterals to quell the investors' fears and placate them and let their guards down.

87.     Defendants' representations to the Plaintiffs were materially false and were done in order to induce the Plaintiffs to invest their money with the LLLP.  At the time Defendants made the representations, they knew them to be false.

88.     Defendants' active concealment of and knowing failure to disclose material facts deprived the Plaintiffs of information critical to their decision to invest their money into the LLLP.

89.     Defendants' representations and concealments induced the Plaintiffs to sign the Offering Documents and the Plaintiffs specifically relied on the representations in entering into

the Offering Documents, and they were justified in doing so.

90.     Defendants made the representations knowing that the information was false.

91.     Defendants made the representations with the intent that the Plaintiffs rely on such representations.

92.     If the Plaintiffs had known the true facts, the Plaintiffs would not have entered into the Offering Documents.

93.     As a result of Defendants' conduct, Plaintiffs have been damaged by Defendants' fraudulent inducement in an amount to be determined at trial.

94.     Plaintiffs were harmed by Defendants' deceptive and fraudulent acts and thus are entitled to rescission of the Offering Documents and a return of their full investment, administrative fees and prejudgment interest, punitive damages in the amount according to proof.

95.     Defendants' conduct in concealing material facts such as their failure to transfer title to the collateral units and their continued concerted effort to mislead the Plaintiffs in believing that their investment was fully secured caused Plaintiffs to rely on these false representations to their detriment.

## COUNT II

### (By Plaintiffs Individually and Derivatively on Behalf of the LLLP for Breach of Fiduciary Duty against CRC and GP)

96.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

97.     As the regional center entrusted by the Plaintiffs to oversee their investment into Solaris, CRC owed Plaintiffs the duty to exercise candor, good faith, and loyalty in the management and administration of the EB-5 Investors investment.

98.     As the general partner of the LLLP entrusted by the Plaintiffs to manage the EB-5

Investor's investment, GP owed Plaintiffs and the LLLP the duty to exercise candor, good faith,

and loyalty in the management and administration of the EB-5 Investors investment.

99.     CRC and GP's violated and breached their fiduciary duties of candor, good faith,

loyalty, reasonable inquiry, oversight and supervision as set forth herein in paragraphs, *inter alia*,

56, 66, 68, 70, 73 and 74.  Their conduct was due to their intentional or reckless conduct.

100.    As a direct and proximate result of their breaches of their fiduciary obligations,

the Plaintiffs have sustained and continue to sustain significant damages. As a result of the

misconduct alleged herein, the defendants CRC and GP are liable to the Plaintiffs.

## COUNT III

**(By Plaintiffs Individually for Violations of the Colorado Consumer Protection Act –**

**C.R.S. §6-1-105(1) against All Defendants)**

101.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if

fully set forth herein.

102.    The Colorado Consumer Protect Act ("CCPA") was designed to deter and punish

deceptive trade practices by businesses that deal with the public.  The act allows private rights of

action.

103.    Defendants engaged in an unfair and deceptive trade practice as described in

paragraphs, *inter alia*, 56, 66, 68, 70, 73 and 74.

104.    The practice occurred in the course of the Defendants' business.

105.    The practice significantly impacts the public as actual or potential customers of

Defendants' services or property.

106.    As a result of Defendants' unfair and deceptive practices, Plaintiffs suffered

injury in fact, which was caused by Defendants.  Plaintiffs are entitled to restitution.

## COUNT IV

### (By Plaintiffs Individually for Violations of 15 U.S.C. 80a against the LLLP and the GP)

107.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

108.    The Offering Documents stated that it was exempted from registration because it had fewer than 100 investors.  The Offering Documents on its face indicated that it was seeking $80 million with a minimum subscription fee of $500,000, which rendered the total number of investors to exceed 100.

109.    Because the offering by the LLLP and orchestrated by the GP exceeded the maximum number of investors, the LLLP and GP were required to register as an investment company.  As a result, the Plaintiffs are entitled to a rescission of their investment.

## COUNT V

### (By Plaintiffs Individually for Violations of the Federal Securities Exchange Act - 15 U.S.C. 78o and 78j against All Defendants)

110.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully set forth herein.

111.    15 U.S.C. §78o makes it unlawful for any broker or dealer to make use of any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such broker or dealer is registered.

112.    The Defendants, and each of them, aided and abetted in the use of Agents to solicit investment and sell limited partnership interest in the LLLP, which constitutes as securities.  The Defendants continue to sell securities when they offered "put" options to the

Plaintiffs in order to unload their interest in the LLLP.  Neither Defendants, nor, their Agents were registered brokers or dealers.  Accordingly, Defendants are in violation of 15 U.S.C. §78o.

113.    15 U.S.C. §78j makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce to use or employ any manipulative or deceptive devices in connection with the purchase or sale of any security.  As set forth above in paragraphs, *inter alia¸* 56, 66, 68, 70, 73 and 74, Defendants used manipulative and deceptive devices to induce the Plaintiffs into purchasing limited partnership interest in the LLLP.  Accordingly, Defendants are in violation of 15 U.S.C. §78j.

114.    Accordingly, the LLLP, is required to fully refund the EB-5 Investors' investment of $500,000 plus the administrative fees they paid.

## PRAYER FOR RELIF

WHEREFORE, Plaintiffs pray for judgment as follows:

115.    For compensatory damages to be proven at trial, but not less than the full amount invested by the EB-5 Investors;

116.    Rescission of the Offering Documents including but not limited to: Subscription Agreement and Limited Partnership Agreement;

117.    Prejudgment interest at the legal rate since the date the Plaintiffs were entitled to the return of their investment;

118.    Restitution;

119.    Award of reasonable attorneys' fees and costs;

120.    Any such other and further relief as the Court may deem just and proper.

121.    For punitive damages according to proof;

122.    For attorney's fees and costs as permitted by statute or law;

123.    For such equitable, injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.


ARDENT LAW GROUP, PC


/s/ Hubert Kuo
Hubert Kuo
**Ardent Law Group**
4340 Von Karman Ave.,
Suite 290
Newport Beach, California 92660
Telephone: (949) 299-0188
Facsimile:  (949) 299-0127
hkuo@ardentlawgroup.com